May it please the Court, Richard Stevens representing the Defendant Appellants in this case, and I'd like to reserve seven minutes for rebuttal. At the heart of this dispute is At the heart of this dispute is essentially liability imposed on my client for not obtaining permits when none was required. And our position is that this has implications not just for waterfront homes but coastal cities and ports throughout the West. I'd like to address the Rivers and Harbors Act issue first. And our position is that statute has three distinct clauses with different requirements, and the government's argument has essentially reassembled the different clauses to create a different violation. The second clause, which we understand is the one at issue in this case, is the prohibition on building in waters of the United States without a permit. And there is no evidence in this case that my clients built in waters of the United States. Well, doesn't the Alameda case dispose of that? Not at all, Your Honor, because Alameda is a first clause case, a case that prohibits obstructions to the navigable capacity of the nation's waterways. In that case, Congress had actually declared that Alameda Gateway's facility was an obstruction to navigable capacity. The government has essentially argued, well, we don't have to show that in a second clause case such as yours, but we don't have to show that you built in navigable waters under the first clause. And our position is there is a distinct requirement in each clause. One is that you're either obstructing navigation, as in the first clause, as in Alameda Gateway, in which the government can require you to be removed. And the second clause, in which there's a violation only if you build in navigable waters or waters of the United States when you do so. Well, I thought the Ninth Circuit has interpreted that as including maintaining, maintaining a structure, not just building. There isn't case law that says maintaining simply by its existence. I would agree if my clients had added more material to a structure and it was within the jurisdiction of the Rivers and Harbors Act, I would agree that maintenance is essentially building it. Well, doesn't maintaining also include keeping it there? Well, if that were the case, then the language building in is meaningless. It would mean that if you simply, the structure's existence were there, that would be a violation of the RHA. And I think our position is bolstered by Section 12 of the Rivers and Harbors Act, which talks about criminal penalties and injunctive relief for structures that are, quote, erected in waters of the United States. Both Section 12 and Section 10 indicate that you have to do the work in the water of the United States unless you are in obstruction to navigable waters under the first clause. I'd like to next move to the trespass cause of action. The summary judgment on trespass in this case is based on the assumption that the defendants, my clients, built their shore-to-front structures on their own land or their predecessors did. They did it above mean high water, and the area between mean high water elevation and their structure has since eroded away. And the question, the critical question in this case is, does the property boundary, do you ignore a man-made structure? And the district court's authority that it relied on, excuse me, is the cases, the numerous cases that say waterfront boundaries are ambulatory. And we agree with that to a point, and that is as long as the water body itself, as long as its border ambulates or moves, then the property line of the upland owner moves along with it. But when somebody builds on their own property and effectively keeps the water line from moving, then the property line does not move either. That is essentially our position. What case supports that notion? Well, there are cases that there's not, frankly, we're here because there's nothing specifically on point. But there are cases that talk about these kinds of structures being fixtures to land. They become part of the land. And we believe it is supported by the common enemy doctrine, common enemy doctrine which makes, says over and over, that an upland owner has the right to defend their property. They don't have the right to go on to somebody else's, but they have a right to go on their own property and defend it from the ravages of the sea. Well, now, usually these cases are ones where you've got water that you're trying to divert off your property. And I've never seen it applied in the context of the moving shoreline. And, Your Honor, most of the disputes that end up in litigation are between neighboring property owners as you describe. But, again, the law comes from, basically comes from the common law of England in which the king owned the tidelands. And there's nothing to suggest that this right to defend your own property and, therefore, affect tidelands is somehow any less simply because the king owns the tidelands. But I guess the problem is that we've always thought that you can have accretion or you can have diminishment of your property, and you just have to live with those changes so that your client no longer owns that property. It goes to the mean high water line. The problem with that analysis, Your Honor, is this. As long as the property, as long as the boundaries are unaltered, that is true. But, again, our position, based on authorities like the common enemy doctrine, that you have the right to build on your own property to defend it. And I would argue that there are numerous places in the United States where people have protected their own property with dikes. San Francisco, San Jose, the Duwamish Waterway, there are dikes that protect land. And the government's position in this case is that the tideland owner has a right to have those dikes removed. And there is no law to support that. The law that we're used to hearing, that people are entitled to accretion or loss by erosion, that is true. And if there is, in fact, erosion, despite my client's efforts to protect their own property, the property boundary moves where the water boundary moves. Unless there's a structure. Is that what you're saying? Well, no, I'm saying that with a structure, the structure can stop the water body's boundary. All right, that's what I understand. Now, what's the best case for that proposition? I would say any of the common enemy doctrine cases that we cite. That's what you're relying on? Primarily. Is that federal law? There are cases throughout the country the U.S. Supreme Court has referred to the doctrine as well. So I believe it is part of the federal common law. Do you have a case where it's applied to mean high water lines? I cannot think of a case right now where that's the case. All I can tell you is that whenever the court says you have the right to protect your property from eroding away, that means that you're not allowing the property to erode away. And, again, the result would be that everybody who has their property protected by any kind of dyke or structure to prevent the water body from encroaching on their land, the tied land owner would have the right to have that removed. Serious consequences, I think, for most waterfront property on New Orleans, obviously, and Boston and many other places as well. The ‑‑ I'd like to now deal quickly with the Clean Water Act claim against the Nicholsons and particularly the summary judgment. The parties on that issue apparently agree that the summary judgment was improper. On summary ‑‑ I don't understand that. What's the basis for the confession of error? Are you going to talk about that? Well ‑‑ What's wrong with the summary judgment under the Clean Water Act? I would ‑‑ the confession of judgment is by the United States. Confession of error. Excuse me. Excuse me. Confession of error is by the United States. I prefer to let them argue why ‑‑ All right. ‑‑ why they have done that. But what's wrong with the summary judgment? That's what I'm looking at. There's a couple of reasons. One, we think the district court was wrong on the law. And that is the question of whether a person can be in violation of the Clean Water Act for building in an area which is above mean high or high water. That is the issue of law, which essentially the government doesn't want answered here and wants to go back for trial and come back here again and answer that. As opposed to the high tide line. That's right. The core regulations say high tide. And the question is, what does high tide mean here? And in the first summary judgment ruling, Judge Rothstein said high tide is not mean high or high water and it doesn't matter that the Army Corps of Engineers in the Seattle District has said consistently over and over again that that's their line of jurisdiction. So that's where we are on that summary judgment being wrong as a matter of law. We believe it was also wrong because, as a factual matter, because Judge Rothstein relied upon some preconstruction sketches saying, oh, this preconstruction sketch shows that Nicholson's did work below mean, below the high tide line. And we provided evidence, people involved in the construction, that says that doesn't show what was built. And so that was not sufficient evidence. There was a dispute of fact as to what was actually built. Maybe the government can answer this, but it seemed odd that Judge Layton was making some different findings than Judge Rothstein had. Well, first, Judge Rothstein did not issue findings, per se. She said that high tide is above mean high or high water. And that there's evidence, undisputed evidence in her view, that Nicholson's had done work at that level. Judge Layton, we had a trial. Our defense of the trial primarily was, the trial on penalties, our defense was primarily that we didn't believe we needed a permit because we did everything above mean high or high water. We're not talking about high tide. We're talking mean high or high water. That was the focus of the trial, and Judge Layton found that we didn't do any work below mean high or high water. So we had this different views of the law between Judge Rothstein and Judge Layton, and our position is that we need to know what is the jurisdictional boundary, and if, in fact, it is mean high or high water in this location, there's no need to go back for a trial. But if Judge Rothstein is correct that it's something above, then we need to have that answered before we go back, or otherwise we'll be right back here again, I'm afraid. And at this point, Your Honors, I would like to reserve my remaining time for a bow. Okay. Good morning. May it please the Court.  I'll be sharing my time this morning with counsel for the Lummi Nation. We've informally decided on a 15-minute, 5-minute split, and we'll see how that goes. I want to address first the Rivers and Harbors Act violation, which is where counsel for the landowners started. The argument as to the construction of Section 10, if we were writing on a clean slate, would perhaps make a very interesting argument, but we are not writing on a clean slate. As Judge Schwartzer pointed out, we have the Alameda Gateway case to go by. We also have the Boyden case. We have a number of cases by the U.S. Supreme Court. There is a long history of cases interpreting Section 10 and Section 12. And what those cases say is that Section 10 and Section 12, the Rivers and Harbors Act in general, are given a broad and indeed a charitable construction. That is the language used in the Republic of Seattle case by the Supreme Court. What the purpose of Section 10 is, as the cases tell us, is to keep the nation's waters free of obstructions. And it doesn't matter for that purpose whether the obstruction comes to the water or whether the water comes to the obstruction. It is still an obstruction, and it is still subject to permitting by the U.S. government. And what the Boyden case teaches us is that there isn't three separate violations, as counsel says. The first clause of Section 10 merely sets out the general rule, no obstructions in waters of the United States without congressional permission. Clause 2 and Clause 3 set forth specific structures and specific activities that can go on in waters of the United States with a very large caveat. And that caveat is that they are presumed unreasonable unless they receive a permit from the U.S. Army Corps of Engineers, a permit application, I should say. And the U.S. Army Corps of Engineers determines, exercising its administrative discretion, that the activity or the structure is not unreasonable and can stay in waters of the United States for as long as the United States deems the obstruction to be appropriate and under conditions that the U.S. Army Corps of Engineers determines. And absent a permit, then the structure is subject to removal, as is the case here with Judge Rothstein indicating, finding, concluding, and these facts aren't disputed, that these structures are in navigable waters of the United States, that they do not have a permit, that they are structures, and therefore they are subject to the permit requirement. Turning next to the trespass issues, we had a very long hearing. Well, it wasn't a long hearing, but it was a long argument. It was an interesting argument having to do with this notion that structures placed in water with an ambulatory boundary somehow arrest the ambulatory boundary line. And as I think was exposed quite well by the Court, there is no case that sustains counsel's position that somehow a structure placed in the water somehow causes the bargain, the contract by which a person received their property, which is to say subject to an ambulatory boundary and subject to gains and losses, depending on how the boundary ambulates, that somehow that contract is set aside when someone puts a structure on their property to stop it. And in a sense, as in this case, is arguing that now we can appropriate law that would not, sorry, we can appropriate land that would not otherwise belong to us under the understanding by which we got our property. The properties are subject to an ambulatory boundary, and the fact that a structure is placed on that ambulatory boundary makes no difference whatsoever. None of the cases hold that. And the common enemy doctrine also, even if it were applicable to this circumstance, and I would submit it's not for the very reason that Judge Fletcher indicated, which is it's a doctrine that has to do with moving water, which is a common enemy to people that is transient, that is surface water, that one needs to move off their land. But the notion that you move that water off your land, someone can't sue for trespass. Even if somehow that doctrine could be converted to this circumstance, and I would submit I don't know how that could occur, the law of the state of Washington, which guides us here, which is adopted as federal common law because there is no other precise common law, federal common law rule on this particular issue, indicates that the common enemy doctrine doesn't apply to tidal water. And that is as a result of an amicus brief filed by the landowners in a Washington Supreme Court case, found the common enemy doctrine does not apply to tidal waters. Turning to the confession of error. The government has confessed to error in answering your question, Judge Schwartzer. The reason for that is because Judge Rothstein determined, as a matter of law, that there was a CWA violation. Judge Layton's findings of fact, if they are correct, if they are the rule of the case, would essentially undermine the notion that there are undisputed questions of fact with respect to a CWA violation. If Judge Layton's finding of fact proved to be correct on the merits in this case, there would not be a CWA violation. I, in fact, and I think counsel in this brief may have quoted it, I stood up in a colloquy with the court and told him just that. We need to prove a discharge in waters of the United States to sustain a CWA violation. Judge Layton believes that that didn't occur, and as a consequence, we believe that the better decision in that case was for us to agree that the summary judgment should be set aside and the matter should be remanded for an adjudication on the merits. Well, you would read Judge Layton's ruling as saying that the discharge was below the mean high water line and, therefore, not a violation of CWA because it didn't go up to the high tide line. Judge Rothstein basically said that the discharge occurred within the court's jurisdiction as measured at a minimum by mean high water and mean higher high water. In other words, she was saying that she was convinced that the evidence by the government established as a matter of uncontroverted fact that whether you're using mean high water as your line, mean higher high water as your line, or the high tide line, she was convinced there was a discharge in navigable in waters of the U.S. What Judge Layton said is I'm going to interpret the court's policy, and the court's policy is that if the discharge is going to be above mean higher high water, which is still within, still could be within the court's jurisdiction, nevertheless, if it's above mean higher high water, we're not going to require someone to get a permit. But the judge made that finding in the context of the remedy proceedings. He accepted Judge Rothstein's finding of liability. That is correct, Your Honor. He just determined these facts for purposes of assessing the appropriate penalty. It could be reconciled, can it? It's difficult to reconcile the two decisions because clearly Judge Layton was of a mind that the violation of the Clean Water Act was as a result of migration of water, not as a result of discharge into water.  He didn't hold that. Well, maybe I read the opinion wrong, Your Honor, but that's what I understood him to be saying. And as a consequence, because he seemed to be saying that he thought that was the violation and not a discharge within court jurisdiction, that therefore there wasn't a violation. But you're absolutely correct, Judge Schwartzer. I have trouble understanding the decision myself because it was done on the premise that Judge Rothstein's determination of a violation stood and that the only reason we were before the court was to determine what the remedy was going to be as a result of that violation. So why remand the case? What would happen if it were remanded, in your view? The summary judgment would be undone. There would be a trial on the merits, Your Honor, as to whether a Clean Water Act violation occurred. And we would submit proof, and I assume that the landowners would submit proof, and we would submit it to a trier of a fact, to the trier of fact, which in this case could be a jury. And so the only issue is if, in fact, there was a violation, what should the penalty be? I'm sorry. If, in fact, it was determined after trial that there was a violation, then the remedy would just be money fine? No, the remedy could be, and we asked for a remedy of removal, although the remedy of removal that we asked for was on the condition that they first apply and obtain a permit. If they applied and obtained a permit from the court, then it would only be money. And if they didn't apply for or get a permit from the court, that there would be removal of the structure. Now, are they trespassing? Yes, Your Honor, very definitely. So they'd have to, if, in fact, we were to sustain that, they would have to remove anyway. Is that right? Yes. I think the difference would be whether the entire structure would have to be removed, which is the remedy that we would ask for under the Clean Water Act. Under the Rivers and Harbors Act and trespass, the removal would only be insofar as the structure was waterward of the line of mean high water. And do we factually know where that is now? We have a survey. I believe the last survey we did was 2006. We assume that it's relatively in the same place, but we haven't done a survey since 2006. So how much of the structure is trespassing now? As of today, as I'm standing here, I'm uncertain how much is trespassing today. Well, what about in 06? In 06, there was a fair quantity. As I recall, the survey, at least it varies structure by structure, but we're talking about the Nicholson structure. The Nicholson structure, as I recall, the line of mean high water, essentially we have a structure which has a wall, a bulkhead, and then riprap in front of that. And as I recall the survey, most of the riprap in front of the bulkhead would have to come out as a result of the injunction. But not the bulkhead. Not the bulkhead itself. But under the Clean Water Act, you would be demanding that the bulkhead go also? If the Nicholson's were not able to obtain a permit from the court, yes, Your Honor. Why hasn't the government stopped from raising these issues now in their confession of error? Didn't the government have an opportunity in the proceedings by Judge Layton to make its point? Well, if we have it to make the point about the basis on which you want to have a new trial. Well, the decision came out, Your Honor, and there was a certain penalty and a certain injunction. We looked at that. We went through our review process, and we decided not to appeal that. And we're only here before this Court on the Nicholson's appeal. Of course, if the judgment is indeed reversed, then we do want a trial, an adjudication of the merits. But aren't you barred from that by having failed to file your own notice of appeal, take a cross appeal? I don't think so, Your Honor, because as the matter comes up before appeal, it comes up without having an adjudication on the merits. The way it was posed at the district court, we had a finding of liability and then a penalty hearing. And as a result of both orders, the net result is the Nicholson's are liable under both orders. So if we reverse those and undo those, I think the only way to do that is to go back to square one. But, no, I don't think that we are bound by anything. We're before the Court having prevailed on a summary judgment motion, which the Nicholson's are asking to be undone. But if we affirm, there would be no reason to remand, right? That's correct. If you affirm the judgment, there would be no reason to remand. Now, under the judgment for the Clean Water Act, Judge Layton wasn't requiring that they remove anything. They just imposed a fine. Is that right? He issued an injunction. My recollection is that the judgment did not require that much more removal, if any, than was required under Judge Rothstein's prior trespass injunction and Rivers and Harbors Act injunction. I see that I'm questioning. But nothing has happened since Judge Rothstein's injunction was issued, at least on the riprap. Nothing's happened. The case has been State pending appeal. The injunction was State pending appeal? Yes, Your Honor. The landowners pursuant to that order are paying the Lummi Nation for their use of the property. But the injunction itself is State. Was there any attempt to just sit down and try and, you know, settle this? Many, Your Honor. Very many. In a way, it's odd that the Nicholson's are appealing this. They may lose more than just a fine. I agree, Your Honor. Okay. I'm trying to understand this case. It's a little bit of an enigma. I agree. I'm going to defer to counsel for the Lummi at this point if there are no more questions. Let me just ask one question about the attorney's fees. Sure. Now, as I understand the record, you confessed that the court had no choice to dismiss the case's claims under the Clean Water Act against the other defendants because it had no evidence. That statement is taken out of context, Your Honor. What we said is that we had no evidence of certain things. We had other evidence. But the reason that we decided not to go forward to that point is because we had won, and this is what the district judge determined, we had won essentially everything that we had set forward to do in the case. We had this additional claim, and it was really a cost-benefit analysis in terms of what more we had to gain in terms of what more we had to do. And as this case demonstrates, Clean Water Act violations are very difficult to prove, and we felt that we had won what we needed to win at that point. Thank you. Thank you, Your Honor. If it please the Court, I'm Harry Johnson on behalf of the Lummi Nation. Our part of the case is very simple. There's two basic principles of property law that are involved here. The first one is that no person, no property owner has the right to unilaterally alter the boundaries of his property to the detriment of his neighbor. And when Mr. Stevens argues that we're only protecting our property, one has to consider what is the property that's being protected. An inherent feature of any tideland-bounded property is that the boundary does move. So when you argue we have the right to stop that, you're arguing that you have the right to alter part of your inherent property. It's a reciprocal right with your neighbor. The second principle, also unexceptional, is that no person has the right to use his neighbor's land without his neighbor's consent. And that's what's going on here. Now, if we look at the issues that are not in dispute, the answers to the trespass portion of the case become very obvious. First of all, it's not disputed that the boundary between the upland and the tidelands is a natural feature, not an artificial line. It is, as Mr. Stevens conceded in his argument this morning, an ambulatory boundary. It inherently moves. The second undisputed fact, and it's a geophysical fact, is that on a beach, especially a beach in tidewater, the beach changes constantly. It literally changes every time a wave strikes the beach. You sit on a beach, you watch pebbles roll back and forth. Well, over time, not just with the high season and the low season, but over any time period, any beach is going to change its profile. And because the boundary on a tidal property is the intersection of an elevation with the slope of the beach, as the slope of the beach changes, the boundary moves back and forth. Now, the parade of horribles that we've heard from Mr. Stevens about, you know, what this could mean in other places I think is answered by the question that one of you put forth, can't you just sit down and settle this? These bulkheads were constructed initially during a time when the tide lands fronting Sandy Point were leased by the tribe to a community group. That lease expired in 1988. The lessees had the absolute right, absolute option under the lease to renew it. They chose not to. The attitude at that time was, why should we pay for something we can get for free? That's what generated this case. You ask about what the status of the injunction and the properties is now. We settled with a couple of the property owners. They agreed to pay a fee based on the value of their property. That same formula was applied as an appeal bond, essentially, for the four property owners who appealed. They have been paying those amounts. Not always exactly on time, but they have been paying them. It gives us a template for the future. That's how this case should be resolved. Was there any discussion with the court's, what's it called, settlement unit, with the Ninth Circuit settlement unit about maybe trying to resolve this case? As I recall, we went through extensive mediation at the twelfth court level. How about at our court level? And I believe that the parties informed the Ninth Circuit that further mediation was not likely to be successful. We have tried over the years. And this is, I want to emphasize that this is not a case where the tribe bears any animosity toward these people. They don't think they're evil. It's just a question of property rights. And that's what it comes down to. There are a couple of points in the reply brief on what I think are collateral issues. They deal with the executive order and the equal footing doctrine and things like that, that have not been raised today. I want to make two quick points. One is that our position on the executive order is that this is not an executive order reservation. It's a treaty reservation with boundaries defined under authority, delegated in the treaty itself, and approved by Congress. Those boundaries are defined by the executive order, but it's under a delegation that Congress approved. The second point is that there are several arguments indicating that somehow executive orders don't create the same types of rights in tribes that a treaty or a statute would. With regard to the United States, that may be true in some instances, but it is definitely not true with regard to any third party. That would include the state, and it would also include the parties here.  Thank you. Thank you. Thank you. I'd like to respond to the Rivers and Harbors Act argument first. Mr. Kipnis argues that the purpose is to prevent obstructions to navigable waterways, and that obstructions of certain types require a permit. The plain language of the statute is if there's an obstruction to navigable waterways, you can't have it without congressional approval. The court can't approve an obstruction. What they can approve is a structure that's built in the navigable waterways. That's the distinction. In the ‑‑ in my answer to the question about cases on the right to protect your own property, I do rely on common enemy doctrine cases, but I'd also refer to the court to a Third Circuit case called U.S. v. Stoico Homes, a case that recognized the principle that if you have allowed filling, it becomes fast land. The same principle is also recognized in New York v. New Jersey, a case involving the boundaries of Ellis Island. These principles are recognized. The New York case is not. You know, it's dicta. It is an explanation for its own rationale in that case, the principle upon which we're relying on. I'd also like to deal with the Clean Water Act issue. I think it's important to recognize that Mr. Kipnis is saying that if Layton, if Judge Layton is correct, then there's no need for a trial. And Justice Layton's findings are unappealed. And unappealed findings are verities unappealed. And so that's why we say we should not have to be drugged back through another trial. Well, let me ask, the only result from Judge Layton's ruling was a small fine. Is that right? And an injunction. And what did the injunction say? The injunction required them to remove material as shown on, I believe it was the 2002 survey. Now, that would also be required under the, if we upheld the trespass. Is that right? That's correct. That's correct. Judge Layton did not specifically refer to the notion that the government could, that this case created an affirmative obligation to continue to respond to whatever surveys that was in Judge Rothstein's summary judgment order. Didn't Judge Layton give the Nicholson's an opportunity to get a permit as opposed to removing? I thought he said you have a certain amount of time to get a permit. Yes. Yes. You have so many days to get a permit, and if you don't, then you would have to remove. So you don't have to remove if you get the permit. That's correct. And that applies to structures above the mean high waterline? No, that would apply to structures below the mean high waterline. Oh, excuse me. Measured by the mean high. Yes, exactly. Okay. Yes. So they don't really have any complaint if they can get a permit? Then they won't free except for the nominal penalty. Well, which raises the question, you know, why are the Nicholson's here? Yes, why are they here? I've been trying to understand that. The Nicholson's, Mr. Nicholson is a developer, and he cannot afford to have on his under his watch as a developer, he would be a repeat offender. He cannot afford to be a Clean Water Act violator, and that's why it is worth appealing this decision. Even though it's on different property? Yes. Yes, it is. It doesn't matter. Have you tried to sit down? Oh, yes. We'll have a few serious conversations about the government and, you know, with the posture of the case, government is feeding air. There was extensive, as Mr. Kipnis indicated, there was extensive efforts before the mediator when in between Judge Layton and. How bad was the Ninth Circuit mediation? We spent a year. We postponed briefing approximately a year to discuss mediation. We did not do it with the mediator, but. We have mediators who are miracle workers. I understand that. And we spent a year trying to do that. What are the sticking points? Dollars? Primarily. Primarily it is. There are also concerns about the notion, you know, the underlying legal decision that you cannot as a matter of property law build on your own property if it is subject. That has effects for people who have other property as well. But I think it is primarily the dollars. We are here not trying to come up with fair market value. My clients are willing to pay fair market value. We're here over a barrel with the litigation power of the government on the other side. Well, if you were to lose before us, aren't you in a worse position than as if you were to go to the mediation table now? That is true. That is absolutely true, Your Honor. So I guess you have a judgment call there. Yeah. You've got a few minutes. Less than a minute to go. Yes, thank you, Your Honor. Let me just say one other thing that I think is important in this case, is that by my clients building on their own property and stopping the erosion, that does not necessarily mean that the tidelands are any less. It doesn't mean that the Lummies lose anything. The Lummies tidelands are measured between two points of elevation, mean high water and low water. And those are elevation points. And if material accretes or erodes, those tidelands simply move to the west or to the east. It is not a matter, it is a problem if you're filling their tidelands, but if you're improving only your own uplands, then they don't necessarily lose anything by the assertion of those rights. Your Honor, with that, the Court reaffirmed the right for people to protect their own property as rising tides are predicted to be an important issue in the coming years. Thank you. Thank you. The matter will be submitted. We appreciate arguments on all sides.
judges: Fletcher, Paez, Schwarzer